# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| FAYE STRAIN, as Guardian of<br>THOMAS BENJAMIN PRATT,<br><br>   Plaintiff,<br><br>v.<br><br>VIC REGALADO, in his official capacity;<br>BOARD OF COUNTY COMMISSIONERS<br>OF TULSA COUNTY; ARMOR<br>CORRECTIONAL HEALTH SERVICES,<br>INC., CURTIS MCELROY, D.O., PATRICIA<br>DEANE, LPN; AND KATHY LOEHR, LPC,<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 18-CV-583-TCK-FHM |

## OPINION AND ORDER

Before the Court are Motions to Dismiss filed by Vic Regalado, in his official capacity, Armor Correctional Health Services, Inc., Kathy Loehr, Curtis McElroy and Patricia Deane. Docs. 12, 14, 15, 16 and 28. Plaintiff Faye Strain objects to all of the motions.

### I. Introduction

On August 25, 2017, Plaintiff, as guardian of Thomas Benjamin Pratt, filed suit against these defendants in 17-CV-488-CVE-FHM. Doc. 2. In her Amended Complaint, Plaintiff asserted claims for:

- cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against defendants McElroy, Deane, Loehr and an unidentified nurse, and against Sheriff Regalado in his official capacity, as well as municipal liability against Armor;

- negligence against Armor, McElroy, Deane and Loehr; and

- cruel and unusual punishment in violation of Article II § 9 of the Oklahoma Constitution against all defendants.

*Id.* at 20-26.[1]

On March 1, 2018, the Court dismissed the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). *Id.* Doc. 39. The Court concluded Count One of Plaintiff's Complaint—the Eighth Amendment claim—"was drafted in precisely the fashion *Robbins* proscribes, *i.e.*, it is a § 1983 claim against a government agency and a number of individual government actors—referred to collectively as 'defendant'—that fails to specify who is alleged to have done what to whom. Dkt. # 1, at 21-22." *Id.* at 11. The Court further stated:

> Under *Robbins* . . . count one of plaintiff's complaint fails to provide the individual defendants with fair notice as to the basis of the claim against them, to which they are entitled under Fed. R. Civ. P. 8(a)(2). Moreover, even assuming, *arguendo*, that count one of plaintiff's complaint does provide fair notice to defendants, it nevertheless fails to state a claim for an Eighth Amendment violation because it does not allege that any defendant disregarded a risk to Pratt, intentionally denied or delayed his access to medical care, or interfered with his treatment once it was prescribed.

*Id.* The Court concluded that the Section 1983 claim failed because the facts alleged did not establish the prison officials "intentionally denied or delayed access to medical care or intentionally interfered with the treatment once prescribed." *Id.*

The Court declined to exercise supplemental jurisdiction over Plaintiff's remaining claims for common-law negligence against Armor, McElroy, Deane and Loehr and violation of Article II § 9 of the Oklahoma State Constitution. *Id.* at 11-12.

---

[1] The Amended Complaint alleged that Sheriff Glanz and ARMOR had "failed to take reasonable steps to alleviate the substantial risks to inmate health and safety, in deliberate indifference to Mr. Pratt's physical health, mental health, and safety, in deliberate indifference to Plaintiff's serious medical needs." Doc. 2 at 20, ¶60.

Plaintiff refiled the case on November 13, 2018. Case No. 18-CV-583-TCK-FHM. Doc. 2.[2] The Complaint asserts identical claims against the same defendants.[3] The Factual Allegation section of the Complaint is virtually identical to the Factual Allegation section of the Complaint in the previously-filed case, except that, in each claim for relief, it recites the names of individual defendants McElroy, Deane, Loehr and "the unidentified nurse who encountered Mr. Pratt at approximately 3:44 a.m. on December 14, 2015." The Complaint also adds one new factual allegation, specifically:

> 59. In February 2015 an auditor/nurse hired by Tulsa County/TCSO, Angela Mariani, issued a report focused on widespread failures by Armor Correctional Health Services, Inc. to abide by its $5 million annual contract with the County. Mariani also wrote three (3) memos notifying TCSO that ARMOR failed to staff various medical positions in the Jail and recommending that the county withhold more than $35,000 in payments. Her report shows that Jail medical staff often failed to respond to inmates' medical needs and the ARMOR failed to employ enough nurses and left top administrative positions unfilled for months. Meanwhile, medical staff did not report serious incidents including inmates receiving the wrong medication and a staff member showing up "under the influence."

*Id.* at 21.

Defendants have again filed Motions to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

**II. Applicable Law**

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. A motion to dismiss is properly granted when a complaint provides no more than "labels and conclusions, and a formulaic

---

[2] The newly-filed case was originally assigned to Judge Eagan, who recused. Doc. 3.

[3] In a footnote, Plaintiff states that she "refiled this case pursuant to Oklahoma's 'savings statute,'" 12 Okla. Stat. § 100.

recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its fact," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 562.

While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotations omitted). For the purpose of making the dismissal determination, a court must accept as true all the well-pleaded allegations, even if doubtful in fact, and must construct the allegations in the light most favorable to the claimant. *Id.* at 555; *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 120, 1215 (10th Cir. 2007); *Moffett v. Haliburton Energy Servs., Inc.*, 291 F.3d 1227, 1231 (10th Cir. 2002).

### III. Allegations of the Complaint

Plaintiff Faye Strain is the duly appointed guardian and mother of Thomas Benjamin Pratt. Doc. 2, ¶ 1. Pratt was booked into the Tulsa County Jail on December 11, 2015. *Id.*, ¶15. On December 12, 2015, at 7:39 a.m., Pratt submitted a medical sick call note requesting to speak to a nurse about "detox meds." *Id.* At 12:10 p.m., he submitted a second sick call note, stating:

> MY NAME IS TOMMY PRATT I CAME IN YESTERDAY AND STARTED
> HAVING WITHDRAWLS [sic] I NEED TO TRY AND GET SOME DETOX
> MEDS
> THANKYOU

*Id.* At 1:05 p.m., Nurse Karen Canter, an employee of defendant Armor—a private corporation responsible, in part, for providing medical and mental health services to Pratt while he was in custody of the Tulsa County Sheriff's Office ("TCSO")—conducted a drug and alcohol assessment

4

of Pratt. *Id.* Pratt advised the nurse that he had a habit of drinking 15-20 beers for at least the previous ten years. *Id.* The assessment tool indicates that he was experiencing constant nausea, frequent dry heaves and vomiting, moderate tremors, anxiety, restlessness, drenching sweats and severe diffuse aching of joints and muscles. *Id.* at 5-6. Based on this assessment, he was placed on a "Librium protocol" and "seizure precautions" were ordered. *Id.* at 6. At 1:48 p.m., Pratt was admitted to the jail's medical unit, where Nurse Gracie Beardon, an Armor employee and agent of TCSO, conducted a "mental health infirmary admission assessment." *Id.* at 7. Nurse Beardon noted that Pratt was nauseated, slumped over, anxious, fearful, and "unsteady on his feet," and that he posed a "risk for injury" due to his detoxification and "high blood pressure." *Id.*

On December 13, 2015, Pratt was again placed on seizure precautions, which included an order that his vital signs be taken every eight hours. *Id.* On December 14, 2015, at approximately 2:08 a.m., Nurse Patricia Deane conducted another drug and alcohol assessment of Pratt. *Id.* The assessment tool indicated that he was experiencing constant nausea, frequent dry heaves and vomiting, severe tremors even with arms not extended, "acute panic stats as seen in severe or acute schizophrenic reactions," restlessness, drenching sweats, continuous hallucinations and disorientation for "place or person." *Id.*

On December 14, 2015, at approximately 3:44 a.m., an unidentified ARMOR employee attempted to take Pratt's vital signs. *Id.* at 8. The ARMOR employee noted that when he/she encountered Pratt, he was "tearing up" his cell and deliriously stating that he was "locked in the store." *Id.* In a note dated December 14, 2015, and placed in the Armor medical chart, defendant Curtis McElroy, D.O., stated:

> Pt seen and evaluated. Came in 12/11/15 with alcohol abuse and placed on Librium protocol for alcohol withdrawal. Pt switched to valium and received first dose this morning. Pt reported to be found on floor pulling up tile with approximately 2cm forehead laceration. Small, < 1 cm laceration left lateral elbow area and a laceration

5

> < 1 cm on right mid right posterior forearm. Some scratches on dorsum of nose. No other facial injury. Pt awake, confused, talking about what movie are we watching tonight. No history of witnessed fall or pt inflicting injury to himself. Pool of blood under sink in cell.

*Id.* at 8-9.

Nurse Margarita Brown, an ARMOR employee, encountered Pratt in the medical unit at around 4:07 p.m. on December 14. *Id.* at 11. Nurse Brown reported that he was "angry," "anxious" and confused;" and was staring and "reaching into space." She noted that he lacked judgment and had "impaired short term memory" and charted that he needed assistance with "activities of daily living." On December 15, 2015, Licensed Professional Counselor Kathy Loehr conducted an initial mental health evaluation of Pratt. *Id.* at 11-12. Pratt reported that he was "detoxing from alcohol." *Id.* at 12. Loehr charted that Pratt "present[ed] with a wound on his forehead from a self inflicted injury yesterday" and that the wound "[a]ppear[ed] unintentional" as Pratt was "detoxing and did not appear oriented yesterday." *Id.* She noted his memory, insight, judgment and concentration were "poor." *Id.* In a "Medical Sick Call" noted dated December 15, 2015, Dr. McElroy noted Pratt was reported to "have been found underneath sink [in his cell] with laceration [on] mid forehead." *Id.* at 12-13.

On December 16, 2016, at approximately 12 a.m., Nurse Lee Ann Bivins, an Armor employee, observed that Pratt "would not get up . . . ." *Id.* at 13. However, she did not check Pratt's vital signs. *Id.* Just before 1 a.m., a detention officer discovered Pratt lying on his bed and not moving; he called for a nurse. *Id.* Upon entering Pratt's cell, she found that he had no pulse or respiration and was completely unresponsive. *Id.* She initiated CPR and called a "medical emergency" at around 1:00 a.m. *Id.* Shortly thereafter, first responders arrived and continued CPR. *Id.* Pratt was resuscitated at around 1:15 a.m. and was rushed to St. John Medical Center in Tulsa. *Id.*

6

According to the EMSA Report, Pratt had suffered a cardiac arrest. *Id.* the EMSA report also stated that the Jail medical staff reported Pratt had hit his head "four days ago" and had been non-verbal and lethargic ever since; Pratt had been going through withdrawals and been on suicide watch; and he had a large hematoma to his forehead from his fall "four days ago." *Id.* at 13-14.

Pratt was admitted to the hospital, where he remained until January 1, 2016. *Id.* at 14. Upon discharge, he was diagnosed with cardiopulmonary arrest secondary to presumed seizure during incarceration; acute renal failure secondary to hypotension and Rhabdomyolysis; Todd's paralysis; agitation; anoxic brain injury and AKI: secondary to hypotension and rhabdomyolysis; hyponatremia; transaminitis: acute; and head laceration: acute. *Id.*

Before Pratt was admitted to the jail on December 11, 2015, he had no history of seizure disorder, brain damage or severe mood swings. *Id.* Since suffering from untreated brain injury and delirium tremens which led to cardiac arrest/severe seizures at the Jail, he has been permanently disabled. *Id.* He continues to suffer from severe seizure disorder, memory loss, extreme mood swings and anger and verbal/communication delays/deficits. *Id.* he is now unable to work and has been homeless at times. He requires assistance with everyday life activities. He is incapable of safely living on his own. *Id.*

The Complaint alleges there are longstanding, systemic deficiencies in the Jail's medical and mental health care services, about which Former Sheriff Stanley Glanz knew. *Id.* at 15. Plaintiff alleges that in 2007, the National Commission on Correctional Health Care ("NCCHC") audited the Jail and concluded there were numerous deficiencies in the care provided to inmates, including failure to address health care needs in a timely manner. *Id.* In 2009, the Oklahoma State Department of Health cited TCSO for violation of the Oklahoma Jail Standards in connection with the suicide death of an inmate with schizophrenia. *Id.* at 15-16. In August 2009, the American

Correctional Association ("ACA") conducted a "mock audit" of the Jail, which revealed that the Jail was non-compliant with "mandatory health standards" and suggested "substantial changes. *Id.* at 16. In response, the Jail Administrator sought input and recommendations from Elizabeth Gondles, Ph.D., the ACA's medical director/medical liaison. *Id.* On October 9, 2009, Dr. Gondles generated a report which identified issues and suggested improvements ("Gondles Report"). *Id.* The issues included understaffing of medical personnel; deficiencies in "doctor/PA coverage; lack of health services oversight and supervision; failure to provide new health staff with formal training; delays in inmates receiving necessary medication; nurses failing to document the delivery of health services; systemic nursing shortages; failure to provide timely health appraisals to inmates and 313 health-related grievances within the previous 12 months. *Id.* Dr. Gondles concluded that many of the issues were a result of the lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private provider. *Id.* at 17. She "strongly suggest[ed] that the Jail Administrator establish a central Office Bureau of Health Services" to be staffed by a TCSO-employed Health Services Director ("HSD"). *Id.* However, TCSO did not implement the recommendations in the Gondles Report. *Id.*[4]

---

[4] The Complaint also alleges that on October 28, 2010, Assistant District Attorney Andrea Wyrick sent an email to TCSO's Risk Manager, Josh Turley, voicing concerns about "whether the Jail's medical provider, CHMO, a subsidiary of CHC, was complying with its contract." Doc. 2 at 17. Plaintiff stated: "Ms. Wyrick further made an ominous prognosis: 'This is very serious, especially in light of the three cases we have now—what else will be coming? It is one thing to say we have a contract . . . to cover medical services . . . It is another issue to ***ignore any and all signs we receive of possible [medical] issues*** or violations of our agreement with [CHC] for [health] services in the jail. The bottom line is, ***the sheriff is statutorily . . . obligated to provide medical services.***" (emphasis added). Neither CHMO nor CHC is a defendant in this case and this allegation appears to be unrelated to the defendants (including Armor) in this case.

The Complaint also alleges that the NCCHC conducted a second audit of the Jail's health services program in 2010, at the conclusion of which it placed the Tulsa County Jail on probation. *Id.* at 17-18. The NCCHC found numerous serious deficiencies with the health services program, including:

- The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness.

- There have been several inmate deaths in the past year . . . . The clinical mortality reviews were poorly performed.

- The responsible physician does not document his review of the RN's health assessments.

- The responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff;

- [D]iagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician;

- If changes in treatment are indicated, the changes are not implemented;

- When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed; and

- "potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks. (*sic*). Training for custody staff has been limited. Follow up with the suicidal inmates has been poor."

*Id.* at 18. Former Sheriff Glanz read only the first two or three pages of the 2010 NCCHC Report and is unaware of any changes in policies or practices in response to the Report. *Id.*

The Complaint also alleges that over a period of many years, Tammy Harrington, R.N., the former Director of Nursing at the Jail, observed and documented many concerning deficiencies in the delivery of health care services to inmates, including chronic failure to triage inmates' requests for medical and mental health assistance; a chronic lack of supervision of clinical staff; and repeated failure of medical staff to alleviate known and significant deficiencies in the health

9

services program at the Jail. *Id.* at 18-19. On September 29, 2011, the United States Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported its findings in connection with an audit of the Jail's medical system pertaining to the United States Immigration and Customs Enforcement detainees. *Id* at 19. The report stated that "CRCL found a prevailing attitude among clinic staff of indifference . . . ;" "Nurses are undertrained. Not documenting or evaluating patients properly.'" "Found one case clearly demonstrates a lack of training, perforated appendix due to lack of training and supervision;" "Found two … detainees with clear mental/medical problems that have not seen a doctor;" '[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake;" "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years." *Id.*

Director Harrington did not observe any meaningful change in health care policies or practices at the Jail after the ICE-CRCL Report was issued. *Id.* On the contrary, less than 30 days after the report was issued, on October 27, 2011, another inmate, Elliott Earl Williams, died at the Jail as a result of truly inhumane treatment and reckless medical neglect which defies any standard of human decency. *Id.* A federal jury has since entered a verdict holding Sheriff Regalado liable in his official capacity for the unconstitutional treatment of Mr. Williams. *Id.* In the wake of the Williams death, which was fully investigated by TCSO, former Sheriff Glanz made no meaningful improvements to the medical system, evidenced by the fact that another inmate, Gregory Brown, died due to grossly deficient care just months after Williams. *Id.* at 19-20.

On November 18, 2011, AMS-Roemer, the Jail's own retained medical auditor, issued a report finding multiple deficiencies in the Jails medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality." *Id.* at 20. AMS-Roemer commented on no less than six inmate deaths, finding deficiencies in the

care provided to each. *Id.* Sheriff Glanz did little, if anything to address the systemic problems identified in the AMS-Roemer Report, and AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail, including delays for medical staff and providers to get access to inmates, no sense of urgency attitude to see patients, or have patients seen by providers, failure to follow NCCHC guidelines "to get patients to providers," and "[n]ot enough training or supervision of nursing staff." *Id.*

In November 2013, BOCC/TCSO/Former Sheriff Glanz retained ARMOR as the new private medical provider. However, this step has not alleviated the constitutional deficiencies with the medical system. *Id.*

### IV. Analysis

#### A. 42 U.S.C. § 1983 Claim

Count One of the Complaint alleges that all defendants deprived Pratt of his Eighth Amendment right to be free from cruel and unusual punishment, as their deliberate indifference to his medical needs caused the permanent disabilities from which he now suffers. Doc. 2 at 21. "The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Wilson v. Seiter*, 501 U.S. 294, 296-97. As a result, "[p]rison officials have a duty under the Eighth Amendment to provide humane conditions of confinement," including "adequate food, clothing, shelter, and *medical care*." *Farmer v. Brennan*, 511 U.S. 825, 825 (1994) (emphasis added).

However, "in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be repugnant to the conscience of mankind." *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976). Accordingly, "a

complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment," and "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106. Rather, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence *deliberate indifference to serious medical needs*. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.* (emphasis added).

The Tenth Circuit has held that in order to plead a viable Eighth Amendment claim in a prisoner case, a plaintiff must allege:

> (1) "actual knowledge of the specific risk of harm [to the detainee] . . . or that the risk was so substantial or pervasive that knowledge can be inferred;" (2) "fail[ure] to take reasonable measures to avert the harm;" and that (3) "failure to take such measures in light of [the] knowledge, actual or inferred, justifies liability for the attendant consequences of [the] conduct, even though unintended."

*Estate of Hocker by Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir 1994) (citing *Berry v. City of Muskogee*, 900 F.2d 1489, 1498 (10th Cir. 1990). *See also Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015). "The subjective component requires showing the prison official 'knew [the inmate] faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it.'" *Redmond v. Crowther*, 882 F3d 927, 939-40 (10th Cir. 2018) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088-89 (10th Cir. 2009)). "The subjective prong is met if prison officials "intentionally deny[] or delay[] access to medical care or intentionally interfere[] with the treatment once prescribed.'" *Id.* at 940 (citing *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1975)). However, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 2912. Nor does disagreement in medical judgment. *Id.* at 107.

12

Notwithstanding its minor revisions, the Complaint in this case suffers the same fatal flaw as the Amended Complaint in the earlier case: Taken as true, the facts alleged establish that Pratt received medical treatment, although Plaintiff challenges its efficacy. For instance, on December 12—the day after Pratt was booked into Jail—he was seen by a nurse who conducted a "mental health infirmary admission assessment" and was admitted to the Jail's medical unit (Complaint ¶ 18). According to the Complaint, on December 11, 2015, he was placed on Librium protocol for alcohol withdrawal. *Id.*, ¶ 26. He was switched to valium on December 14, 2015. *Id.* Thus, although the allegations arguably state a claim for negligence, they do no establish that defendants *intentionally* denied or delayed access to treatment or intentionally interfered with the treatment once prescribed. Accordingly, the Eighth Amendment claim is subject to dismissal in its entirety. *See Estelle*, *supra*.

### B. Common Law Negligence and Oklahoma Constitutional Claims

Plaintiff's remaining claims for common-law negligence against Armor, McElroy, Deane and Loehr (Count Two) and violation of Article II § 9 of the Oklahoma Constitution against all defendants (Count Three) arise under Oklahoma law. Pursuant to 28 U.S.C § 1367(a), a federal court may exercise supplemental jurisdiction over claims related over which it has original jurisdiction. However, § 1367(c)(3) "expressly permits a district court to decline to exercise supplemental jurisdiction over any remaining state-law claims," and the Tenth Circuit has "repeatedly recognized that this is the preferred practice." *Gaston v. Ploeger*, 297 Fed. Appx. 738, 746 (10th Cir. 2008) (citations omitted). Accordingly, the Court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims.

## V. Conclusion

Defendants' Motions to Dismiss—Docs. 12, 14, 15, 16 and 28—are hereby granted.

ENTERED this 6th day of August, 2019.

_____
TERENCE C. KERN
United States District Judge